IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
Statesville Division

| | |
|---|---|
| Victoria Jolly, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| versus ) | CASE NUMBER _____ |
| ) | |
| Sheriff Donald G. Brown II, in his individual and ) | |
| official capacities as Sheriff of Catawba County; ) | |
| Aaron Turk, in his individual and official capacities; ) | |
| Brian Kelly, in his individual and official capacities; ) | |
| Thad Scronce, in his individual and official capacities; ) | |
| Mike Hoyle, in his individual and official capacities; ) | |
| and John Doe Surety, ) | |
| ) | |
| Defendants. ) | |

**COMPLAINT and JURY DEMAND**

**INTRODUCTION**

1. This is a civil rights and whistleblower-retaliation action arising from a deliberate, escalating campaign by command staff at the Catawba County Sheriff's Office ("CCSO") to destroy Plaintiff's career, credibility, and professional future by manufacturing, weaponizing, and permanently publishing stigmatizing accusations of "bias," "dishonesty," and "untruthfulness."

2. Defendants used internal discipline, selective enforcement, and internal affairs mechanisms not as tools of legitimate accountability, but as weapons to brand Plaintiff as morally unfit and legally unreliable, knowing such branding predictably triggers Giglio impairment, forecloses an officer's ability to testify, and functions as a career-ending sanction in law enforcement.

3. When Plaintiff reported sexual and inappropriate misconduct by a favored male officer, Defendants retaliated by escalating scrutiny and discipline against Plaintiff while shielding the favored officer from meaningful investigation or consequence.

4. After Plaintiff suffered an on-duty concussion and mild traumatic brain injury ("mTBI"), Defendants exploited Plaintiff's known medical vulnerability by isolating her, denying reasonable accommodation, and subjecting her to coercive internal affairs interrogation while cognitively impaired and under documented medical restrictions.

5. The campaign culminated when Defendants caused an F-5 Report of Separation to be filed with the State of North Carolina marking Plaintiff as having a "substantiated allegation of untruthfulness," despite the absence of any criminal investigation, any sustained North Carolina Criminal Justice Education and Training Standards Commission ("Commission") violation, any evidentiary hearing, and any meaningful opportunity for Plaintiff to confront or refute the accusation before publication.

6. Defendants never provided Plaintiff with a name-clearing hearing or any meaningful process to correct the stigmatizing, career-destroying state publication, ensuring the false branding would follow Plaintiff for the remainder of her professional life.

### Jurisdiction and Venue

7. This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

8. Plaintiff brings claims under 42 U.S.C. § 1983 for deprivations, under color of state law, of rights secured by the First and Fourteenth Amendments to the United States Constitution.

9. Plaintiff also brings a federal claim under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

10. This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367.

11. Venue is proper in this District under 28 U.S.C. § 1391 because Defendants reside in this District and a substantial part of the events and omissions giving rise to these claims occurred in this District, including in Catawba County, North Carolina.

## Parties

12. Plaintiff Victoria Jolly ("Plaintiff" or "Jolly") is an adult resident of the State of North Carolina.

13. Plaintiff was employed by the Catawba County Sheriff's Office ("CCSO") as a sworn Deputy Sheriff beginning on or about January 9, 2021, and served in patrol, investigative, and community-facing assignments. Plaintiff's duties included the preparation of reports and sworn documents and, when permitted, providing testimony in court proceedings.

14. Defendant Donald G. Brown II ("Brown") is the elected Sheriff of Catawba County, North Carolina, and at all relevant times was the chief executive of CCSO, with supervisory authority over CCSO personnel, discipline, internal investigations, separation decisions, and required state reporting related to deputies. At all relevant times, Brown acted under color of state law.

15. Brown is sued in his individual capacity for his personal participation in, authorization of, and/or deliberate indifference to the acts and omissions alleged herein.

16. Brown is sued in his official capacity because, under North Carolina law, the Sheriff is the final policymaker for CCSO with respect to employment and disciplinary decisions, internal affairs practices, and the policies, customs, and practices governing separation decisions and state reporting affecting a deputy's certification, credibility determinations, and employability.

17. Defendant Aaron Turk ("Turk") was at all relevant times a command-level CCSO officer who exercised supervisory authority and participated in disciplinary actions and internal investigations relevant to Plaintiff. Turk acted under color of state law and is sued in his individual capacity for his personal involvement and in his official capacity to the extent he acted as a final decisionmaker or implementing authority for CCSO practices at issue.

18. Defendant Brian Kelly ("Kelly") was at all relevant times a command-level CCSO officer with supervisory authority who received and/or acted upon reports of misconduct and participated in decisions and actions relevant to Plaintiff's discipline, treatment, and separation. Kelly acted under color of state law and is sued in his individual capacity and official capacity.

19. Defendant Thad Scronce ("Scronce") was at all relevant times a command-level CCSO officer who participated in internal investigative actions and/or the imposition of investigation-status restrictions affecting Plaintiff. Scronce acted under color of state law and is sued in his individual capacity and official capacity.

20. Defendant Mike Hoyle ("Hoyle") was at all relevant times a CCSO officer responsible for internal affairs and/or internal investigations, including the conduct of witness interviews and investigative interrogations relevant to Plaintiff. Hoyle acted under color of state law and is sued in his individual capacity and official capacity.

21. Defendant John Doe Surety ("Surety") is the surety on Sheriff Brown's official bond issued pursuant to North Carolina law. Surety is joined for purposes of Plaintiff's state-law claims and related relief to the extent permitted by North Carolina law.

## FACTUAL ALLEGATIONS

### Plaintiff's Career, Competence, and the Centrality of Credibility

22. Plaintiff entered CCSO service with substantial prior law-enforcement experience and a strong professional record. She was hired as a sworn deputy on or about January 9, 2021, and served in patrol, investigative, and community-facing roles, including assignment as a senior investigator.

23. Plaintiff's position required strict credibility and accuracy as an essential job function, including the routine preparation of incident and investigative reports, warrant applications, sworn statements, and courtroom testimony. In law enforcement, credibility is not merely a performance metric, it is a job qualification.

24. CCSO's own performance evaluations reflected Plaintiff's competence and professionalism throughout the relevant period. Plaintiff consistently received favorable annual evaluations, including overall ratings of approximately 3.40 (2022) and 3.90 (2023), and an overall rating of 3.60 for the 01/09/2024–01/09/2025 evaluation period (between "Effective" and "Highly Effective"), with multiple above-average category scores and positive supervisory comments praising her work quality, communication, initiative, organization, and report writing. Notably, these favorable evaluations continued even as CCSO treated Plaintiff as Giglio-impaired, underscoring that the later "untruthfulness" stigma was a post hoc label inconsistent with CCSO's own contemporaneous performance assessments.

25. Prior to the events described below, Plaintiff had no sustained history of dishonesty or falsification and no independent basis for a credibility impairment. Defendants understood that formally branding a deputy as biased, dishonest, or "untruthful" predictably forecloses prosecutorial confidence, triggers Giglio-related restrictions, prevents testimony, and functions as a career-ending sanction in law enforcement.

**The Peyton Matter and the Weaponized "Bias Against Children" Narrative**

26. In or around April 2023, Plaintiff was assigned to investigate allegations involving a juvenile, referred to here as "Peyton," arising in a contentious and high-conflict context where emotions and competing narratives were elevated.

27. Plaintiff pursued routine and evidence-based investigative steps, including interviewing witnesses, coordinating with appropriate resources, and evaluating available information for consistency, corroboration, and credibility.

28. Rather than treat Plaintiff's investigative judgment as a good-faith exercise of discretion, Defendant Aaron Turk reframed Plaintiff's conduct as a moral and character indictment, including assertions that Plaintiff was "biased against children" and engaged in "interference with due process." This framing was not limited to critique of methods. It was an attack on Plaintiff's honesty, fairness, and fitness to serve in a credibility-dependent role.

29. On or about May 2, 2023, Turk issued a written reprimand styled as policy violations and imposed discipline including demotion in rank and division reassignment away from Plaintiff's prior duties and into a new role as a school resource officer. The reprimand and attachments further relied on a recorded interview conducted on or about April 26, 2023, which CCSO treated as the central factual anchor for the discipline.

30. The "bias" label and associated allegations were not merely a supervisor disagreeing with an investigative approach. They were stigmatizing credibility judgments, circulated and memorialized in official discipline, and foreseeably calculated to taint Plaintiff's professional reliability and future usefulness as a witness.

### Giglio Impairment and Real-World Prosecutorial Harm

31. Following the imposition and dissemination of the "bias" narrative and related credibility accusations, Plaintiff was treated as Giglio-impaired, meaning prosecutors were unwilling or unable to rely on Plaintiff as a testifying witness in criminal cases.

32. The resulting Giglio impairment materially harmed Plaintiff's ability to function as a law-enforcement officer by restricting or eliminating her usability as a witness, diminishing her effectiveness in investigations, and undermining her professional standing within CCSO and with external prosecutorial partners.

33. On July 6, 2023, an Assistant District Attorney issued a written refusal to prosecute an otherwise viable criminal case, expressly stating that the case would not be pursued primarily because the charging officer had been recently Giglio-impaired and the prosecutor was unwilling to call the investigator as a witness.

34. Defendants knew of, and understood, the significance of this prosecutorial refusal. It was direct confirmation that Defendants' stigmatizing credibility branding had real, measurable, career-damaging consequences, and that CCSO's internal labeling had migrated into the external criminal-justice system as an operational bar to Plaintiff's ability to perform core duties.

### Command Staff Backed Away from "Bias," But Failed to Cure the Damage

35. Plaintiff sought correction of the "bias" narrative through available internal channels, including by requesting that command staff clarify what CCSO meant by "bias" and correct the record to the extent CCSO was treating the issue as something other than a dispute over investigative judgment.

36. In response to Plaintiff's efforts and communications, command staff later revised or softened the original "bias" framing. In particular, Defendant Brown (as Sheriff) issued a written communication acknowledging, in substance, that he did not believe Plaintiff harbored a "bias against children," and command staff thereafter treated the Peyton discipline as a policy or performance matter rather than a moral finding of bias.

37. Despite retreating from the most stigmatizing language, Defendants did not take meaningful steps to repair the foreseeable credibility consequences of what CCSO had already put into the official record. Defendants did not issue a clear corrective statement, did not provide Plaintiff with a documented mechanism to restore credibility, and did not take reasonable steps to ensure prosecutorial partners received information necessary to reevaluate any Giglio-related restrictions that had flowed from CCSO's credibility branding.

38. Instead, Defendants allowed the credibility damage to persist and continued treating Plaintiff as a "problem" deputy, subjecting her to heightened scrutiny and selective enforcement, while the original credibility stain remained in place and continued to affect Plaintiff's usefulness, standing, and future employability.

### **Plaintiff Reports Sexual and Inappropriate Misconduct by a Deputy**

39. While employed at CCSO, Plaintiff received sexually inappropriate communications from a deputy, Kyle Lawrence, including solicitations and messaging of a sexual nature.

40. Plaintiff reported this conduct to Defendant Brian Kelly, a command-level officer. Plaintiff made the report as a complaint about workplace misconduct and abuse of authority within CCSO, not as part of any assigned investigative duty.

41. Rather than initiate prompt, meaningful corrective action designed to protect Plaintiff and address the misconduct, command staff responded in a manner that discouraged formal reporting and increased Plaintiff's vulnerability. Among other things, Kelly suggested that Plaintiff could submit the complaint indirectly, including by placing an "anonymous note" for command staff.

42. The response signaled to Plaintiff that CCSO leadership was unwilling to handle the matter through ordinary accountability mechanisms, and it placed the burden and risk back on the reporting employee rather than the accused deputy.

43. The deputy at issue remained on duty without meaningful sustained corrective action apparent to Plaintiff, reinforcing the perception that CCSO leadership protected favored personnel while the reporter was isolated and exposed to retaliation risk.

44. Plaintiff's report concerned integrity and misconduct within a law-enforcement agency and was reasonably understood as a complaint about abuse of authority and workplace sexual misconduct.

**Retaliatory Targeting and Selective Discipline**

45. After Plaintiff reported the sexual and inappropriate communications, Defendants escalated scrutiny and selective discipline directed at Plaintiff.

46. Plaintiff was criticized and disciplined over minor or trivial incidents that were not treated as disciplinary matters for similarly situated male deputies, and routine events were used as occasions to fault Plaintiff rather than to support her.

47. Defendants used these minor matters to paper Plaintiff's file and build a narrative of "unfitness," while favored employees avoided comparable scrutiny or consequence for similar or more serious conduct.

48. This pattern operated to isolate Plaintiff, increase pressure, and position CCSO to remove Plaintiff while claiming the appearance of legitimacy, rather than addressing the underlying misconduct Plaintiff reported and the retaliatory dynamics that followed.

**The On-Duty Rollover Accident, Concussion, and Known Medical Restrictions**

49. On or about December 2, 2025, Plaintiff suffered an on-duty rollover motor-vehicle accident and sustained a concussion / mild traumatic brain injury ("mTBI") and related physical injuries.

50. On or about December 9, 2025, the Catawba County Legal Department, acting on behalf of the Catawba County Sheriff's Office, issued a written cease-and-desist demand to Josh

Harrington (a non-party). The letter accused Harrington of unlawful use of CCSO's badge and seal on social media and threatened legal action unless he removed the imagery from posts commenting on CCSO and law-enforcement matters.

51. On or about December 10, 2025, Harrington, by and through counsel, responded in writing, disputing the legal basis of the County's demand and asserting that the letter functioned as an effort to chill or suppress public commentary about CCSO and alleged law-enforcement misconduct.

52. These events are consistent with the environment in which Plaintiff's claims arose: CCSO and County leadership used formal processes and legal threats to deter criticism and manage public narrative regarding misconduct allegations, while using internal mechanisms, including discipline and credibility-based stigmatization, to pressure and marginalize those perceived as disfavored or noncompliant.

53. Following the December 2, 2025 accident, Plaintiff sought medical evaluation and treatment and was placed under documented post-concussion restrictions. Plaintiff was prescribed medication that carried known risks of impairment to judgment, alertness, and/or cognition, and she was given restrictions inconsistent with full-duty law-enforcement work, including limitations related to screen time and other work activities.

54. Plaintiff obtained written work-status documentation through Employee Health Connection ("EHC"), a Catawba Valley Family Health Centers clinic used for CCSO employee work-status determinations and return-to-work restrictions.

55. Plaintiff's work-status documentation reflected concussion-related limitations and periods in which Plaintiff was not medically cleared for regular duties during the post-accident mTBI period, along with ongoing restrictions and follow-up care requirements.

56. CCSO had actual and/or constructive notice of Plaintiff's medical restrictions and not-cleared-to-work status. Plaintiff's work-status documentation was generated through EHC for CCSO workplace purposes, and Plaintiff provided CCSO notice of her post-concussion work status and restrictions; further, EHC and CCSO are co-located at the same building/address, supporting CCSO's knowledge of the existence and timing of Plaintiff's restrictions.

57. Defendants proceeded with investigative actions affecting Plaintiff while she was within this documented post-concussion period and subject to the above restrictions, despite notice sufficient to understand that Plaintiff was medically vulnerable and not situated for high-stakes, coercive employment and credibility determinations.

## Investigative Status with Pay and Forced Isolation

58. On or about December 8, 2025, CCSO placed Plaintiff on "investigation status with pay", barred Plaintiff from the worksite and access to CCSO systems, and required Plaintiff to surrender CCSO equipment, keys, credentials, and identification.

59. The investigation-status notice prohibited Plaintiff from reporting to work, limited Plaintiff's ability to access information necessary to respond meaningfully to allegations, and placed Plaintiff under strict command-control requirements during an active concussion/mTBI period.

60. The investigation-status restrictions functioned to isolate Plaintiff, cut off workplace support, and increase pressure and vulnerability at the same time Plaintiff was medically restricted and experiencing concussion-related symptoms.

## The December 8, 2025 "Closet" Incident and Escalation

61. On or about December 8, 2025, Plaintiff overheard CCSO personnel discussing matters involving Plaintiff and Plaintiff's brother, including, upon information and belief, discussion

of allegations concerning an inappropriate relationship between Kyle Lawrence and a Mooresville Police Officer, which Plaintiff understood to be the subject of prior workplace concern and reporting.

62. Plaintiff briefly listened from an adjacent area. Plaintiff did not record, did not transmit information, and did not interfere with CCSO operations.

63. CCSO treated this brief listening incident as serious misconduct and escalated it into a major internal-affairs event rather than addressing it proportionately or through standard supervisory counseling.

64. The severity and speed of the escalation were inconsistent with how comparable workplace conduct was treated for other personnel and were consistent with Defendants' broader course of conduct to isolate Plaintiff, create a paper justification for a pre-determined outcome, and impose a career-ending stigma.

65. The escalation also occurred while Defendants knew Plaintiff was in a medically documented concussion/mTBI period with restrictions and medication warnings, increasing the foreseeability that punitive interrogation, isolation, and rapid escalation would compound Plaintiff's injury and impair Plaintiff's ability to protect her employment and reputation.

**December 9, 2025 Medical Timestamp and Coercive Internal Affairs Interrogation**

66. On December 9, 2025, Plaintiff reported to Employee Health Connection ("EHC") and obtained work-status documentation reflecting ongoing concussion/mTBI impairment, medication warnings, and work restrictions.

67. Plaintiff's EHC work-status documentation reflects a time-in of approximately 2:05 p.m. and a time-out of approximately 2:45 p.m., and further reflects that Plaintiff was unable to work until at least December 15, 2025, along with restrictions inconsistent with sustained computer/screen-intensive and cognitively demanding investigative questioning.

68. Despite actual and constructive notice of Plaintiff's documented impairment and "unable to work" status, Defendants proceeded that same day with a high-stakes Internal Affairs interrogation concerning allegations they characterized as dishonesty and misconduct.

69. During the interrogation, Plaintiff reported concussion-related symptoms including headache and requested that questioning slow down due to the effects of her concussion.

70. Defendants refused to accommodate Plaintiff's request and instead intensified pressure, accusing Plaintiff of "spying" and dishonesty, asserting they possessed "proof," and repeatedly implying or stating adverse conclusions while refusing to disclose the purported evidence or provide a meaningful opportunity for Plaintiff to respond in an informed manner.

71. Defendants communicated, expressly and by clear implication, that Plaintiff faced an immediate fork in the road: resign or be terminated and officially branded as dishonest/untruthful, including through CCSO processes and statewide reporting mechanisms that Defendants knew would carry severe career consequences.

72. Plaintiff's medically documented impairment, combined with the same-day interrogation, refusal to slow questioning, refusal to disclose the alleged "proof," and the threatened stigma outcome, created an inherently coercive environment inconsistent with a voluntary and reasoned employment decision.

73. After Plaintiff resigned during or immediately after the interrogation, Defendant Hoyle stated words to the effect of: "See what I just made her do," reflecting awareness that the interrogation tactics and threats produced the resignation outcome.

74. Defendant Turk stated words to the effect of: "I'll take care of her if you take care of him," referring to Plaintiff and Plaintiff's brother, reflecting an intent to use command authority to "handle" Plaintiff as a target linked to issues involving her brother.

## Constructive Discharge and Involuntary Resignation

75. Plaintiff's resignation was not voluntary in any meaningful sense. Plaintiff resigned under duress during a coercive investigative process while medically impaired and under concussion-related restrictions.

76. At the time of the interrogation, Plaintiff had already been placed on investigation status with pay, was isolated from the workplace, cut off from CCSO systems and supports, and confronted with threatened, career-ending stigma if she did not resign.

77. The totality of the conditions imposed by Defendants, including the timing of the interrogation immediately after EHC documented that Plaintiff was unable to work, the refusal to accommodate concussion symptoms, and the threatened "untruthfulness" branding, were objectively intolerable and were designed or used to force Plaintiff's separation.

## The F-5 "Untruthfulness" Publication and Career Destruction

78. After Plaintiff's separation, CCSO caused a North Carolina Criminal Justice Education and Training Standards Commission ("NC CJETSC") F-5 Report of Separation to be completed, filed, and transmitted as part of the statewide reporting process for sworn law-enforcement personnel.

79. Defendant Brown signed the F-5.

80. The F-5 did not identify any criminal investigation as the basis for Plaintiff's separation and did not identify any Commission rule violation as the basis for separation.

81. Nevertheless, the F-5 marked "yes" to "substantiated allegation(s) of untruthfulness" and thereby branded Plaintiff with a stigmatizing dishonesty designation that Defendants knew would foreseeably and predictably impair Plaintiff's ability to obtain or retain law-enforcement employment across North Carolina.

82. Defendants knew, or should have known, that the "untruthfulness" designation functions as a career-ending credibility stigma in law enforcement because it directly impacts prosecutors' willingness to call an officer as a witness, employers' willingness to hire, and the training-and-standards ecosystem that governs certification and employability.

83. No evidentiary hearing preceded this publication. Plaintiff was not provided meaningful pre-publication notice that CCSO intended to mark "substantiated untruthfulness," was not provided a meaningful opportunity to respond before the stigmatizing designation was recorded and transmitted, and was not provided written findings sufficient to justify the label or permit effective review, rebuttal, or name-clearing.

84. The foreseeable career harm materialized: within the last month, Plaintiff applied for law-enforcement employment and was rejected by the Lincoln County Sheriff's Office and the Troutman Police Department due to the Giglio / F-5 "untruthfulness" designation.

85. Defendants' publication of the "untruthfulness" designation, following the coercive interrogation and Plaintiff's compelled resignation, operated as a career-destruction mechanism inconsistent with CCSO's prior favorable performance evaluations and imposed an enduring stigma in Plaintiff's profession.

## No Name-Clearing Hearing

86. Defendants never provided Plaintiff a meaningful name-clearing hearing or comparable process to refute the stigmatizing dishonesty accusations that Defendants caused to be recorded and transmitted through statewide reporting mechanisms.

87. Defendants did not provide Plaintiff advance notice that CCSO intended to publish a "substantiated untruthfulness" designation, did not disclose the evidence they claimed to possess, and did not identify or present witnesses in any forum Plaintiff could confront or meaningfully respond to before the stigmatizing designation was recorded and transmitted.

88. Defendants also failed to provide any post-publication mechanism reasonably designed to correct the record, withdraw or amend the "untruthfulness" designation, or otherwise mitigate the reputational harm and employment consequences that Defendants knew would flow from the State publication.

89. As a result, Plaintiff was left with a permanent, state-level credibility stigma without due process, and without any meaningful opportunity to clear her name in the law-enforcement labor market.

### Damages

90. As a direct and proximate result of Defendants' acts and omissions, Plaintiff has suffered and continues to suffer lost wages and benefits, loss of career opportunities, and diminished earning capacity, including the loss of realistic prospects for continued law-enforcement employment.

91. Plaintiff has suffered severe reputational injury and professional stigma from the publication of "substantiated untruthfulness," a designation that foreseeably and predictably undermines employability, credibility, and advancement in law enforcement.

92. The stigma-based publication has caused concrete employment harm, including Plaintiff's recent rejection from law-enforcement positions, including by the Lincoln County Sheriff's Office and the Troutman Police Department, based on Plaintiff's Giglio/F-5 credibility impairment.

93. Plaintiff has suffered and continues to suffer significant emotional distress, including anxiety, humiliation, and loss of professional identity and standing, as well as physical manifestations of stress.

94. Defendants' conduct also aggravated Plaintiff's medical injuries, including concussion/mTBI-related symptoms, by subjecting Plaintiff to coercive investigative

pressure and isolation during a medically documented impairment period, and by compounding stress and symptom persistence during recovery.

95. Plaintiff's law-enforcement career has been effectively and potentially permanently impaired by Defendants' stigmatizing state publication and the resulting inability to obtain comparable employment in her trained profession.

### CLAIMS FOR RELIEF

### Count I: First Amendment Retaliation (42 U.S.C. § 1983)
**(Against Turk, Kelly, Scronce, Hoyle, and Brown in their individual capacities)**

96. Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

97. Plaintiff engaged in activity protected by the First Amendment, including speaking and complaining to command-level officials about sexual and inappropriate misconduct**,** abuse of authority, and related integrity failures within CCSO, and seeking redress for retaliatory, stigmatizing discipline that impaired her credibility and ability to perform her profession.

98. Plaintiff's protected activity was undertaken as a complaint about misconduct and abuse of authority within a law-enforcement agency, and was made outside Plaintiff's ordinary assigned investigative duties and not pursuant to any job responsibility to investigate or adjudicate the accused deputy's misconduct.

99. Plaintiff's protected activity concerned matters of public concern, including the integrity of a law-enforcement agency, workplace sexual misconduct by an officer, command accountability, and the misuse of internal processes to punish reporting and suppress complaints.

100. After Plaintiff engaged in protected activity, Defendants took materially adverse actions against Plaintiff, including selective and escalating discipline, heightened scrutiny, internal-affairs escalation, placement on investigation status with pay and associated

isolation, coercive interrogation during a medically documented concussion/mTBI period, constructive discharge, and state-level publication branding Plaintiff as having "substantiated allegation(s) of untruthfulness."

101.    Defendants' conduct would deter a person of ordinary firmness from engaging in protected speech and from petitioning government officials for redress of grievances.

102.    Defendants' adverse actions were substantially motivated by Plaintiff's protected activity. Causation is supported by temporal proximity, escalation following Plaintiff's reporting, selective enforcement and disparate treatment, retaliatory use of credibility-stigma mechanisms, and Defendants' course of conduct culminating in forced separation and stigmatizing state publication.

103.    Defendants acted under color of state law and, by the conduct described above, violated Plaintiff's rights under the First Amendment. Plaintiff is entitled to relief under 42 U.S.C. § 1983.

## Count II: Fourteenth Amendment Liberty Interest (Stigma-Plus) (42 U.S.C. § 1983)
**(Against all Individual Defendants in their individual capacities, and Brown in his official capacity)**

104.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

105.    Defendants imposed stigmatizing accusations and credibility labels upon Plaintiff that went directly to honesty and fitness for duty in a credibility-dependent profession, including branding Plaintiff with disciplinary narratives reflecting alleged "bias against children," and later causing Plaintiff to be designated as having "substantiated allegation(s) of untruthfulness."

106.    These stigmatizing accusations were not confined to internal opinion or coaching. Defendants recorded, relied upon, and caused the dissemination of the credibility stigma

through official channels and processes, including disciplinary documentation, credibility determinations affecting Plaintiff's ability to testify, and the completion, filing, and transmission of an F-5 Report of Separation to the State reflecting "substantiated allegation(s) of untruthfulness."

107. Defendants imposed and published this stigma in connection with adverse alterations of Plaintiff's legal and employment status (the "plus" factor), including demotion and reassignment, placement on investigation status with pay and associated restrictions, coerced resignation/constructive discharge, and separation from employment, with foreseeable and predictable statewide consequences for Plaintiff's certification, credibility, and employability.

108. Defendants knew, or should have known, that branding a sworn deputy as "untruthful" functions as a career-ending credibility stigma in law enforcement because it foreseeably impairs prosecutors' willingness to call the officer as a witness, undermines employability, and forecloses future law-enforcement opportunities.

109. The foreseeable harms materialized. As a direct and proximate result of Defendants' stigma-based publication and the altered employment status tied to it, Plaintiff suffered concrete employment harm, including loss of employment, diminished earning capacity, and rejection from subsequent law-enforcement employment opportunities based on the credibility impairment and/or F-5 "untruthfulness" designation.

110. Defendants failed to provide Plaintiff a meaningful name-clearing hearing or comparable process to refute the stigmatizing accusations before or after publication. Defendants also failed to provide a meaningful mechanism to correct, amend, or withdraw the State "untruthfulness" designation, or to provide written findings sufficient to support the designation and permit effective review and rebuttal.

111.     By imposing and publishing stigmatizing credibility accusations in connection with adverse changes in Plaintiff's legal and employment status, and by denying Plaintiff a meaningful name-clearing opportunity, Defendants violated Plaintiff's liberty interest protected by the Due Process Clause of the Fourteenth Amendment, actionable under 42 U.S.C. § 1983.

### Count III: Fourteenth Amendment Procedural Due Process (42 U.S.C. § 1983)
**(Against all Individual Defendants in their individual capacities, and Brown in his official capacity)**

112.     Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

113.     Plaintiff possessed a liberty interest in her reputation and in pursuing her chosen profession free from stigmatizing state action that, when coupled with adverse employment action, effectively forecloses employability in the law-enforcement labor market.

114.     Defendants deprived Plaintiff of that liberty interest by causing stigmatizing accusations and official "untruthfulness" branding to be recorded, adopted as an official basis for separation, and transmitted through official channels, including the State F-5 reporting process, in connection with Plaintiff's separation from employment and foreseeable statewide employment consequences.

115.     Defendants did so without constitutionally adequate process. Among other deficiencies, Defendants failed to provide meaningful pre-publication notice that CCSO intended to mark "substantiated allegation(s) of untruthfulness," failed to disclose the evidence they claimed to possess, and failed to provide Plaintiff a meaningful opportunity to respond before the stigmatizing designation was recorded and transmitted.

116.     Defendants further failed to provide Plaintiff a meaningful hearing in which Plaintiff could confront and respond to adverse witnesses or evidence supporting the dishonesty

stigma, and failed to provide Plaintiff a meaningful name-clearing hearing either before or after publication of the stigmatizing designation.

117.    Defendants also failed to provide written findings or a reliable evidentiary basis sufficient to justify the "untruthfulness" label, to permit meaningful review, or to allow Plaintiff to seek correction, amendment, or withdrawal of the stigmatizing State publication through official channels.

118.    By depriving Plaintiff of a meaningful opportunity to be heard in connection with the stigmatizing "untruthfulness" designation and its State publication, Defendants violated Plaintiff's procedural due process rights under the Fourteenth Amendment, actionable under 42 U.S.C. § 1983.

### Count IV: Official Capacity Liability / Final Policymaker Liability (42 U.S.C. § 1983)
### (Against Brown in his official capacity)

119.    Plaintiff realleges and incorporates the foregoing allegations as if fully set forth herein.

120.    At all relevant times, Defendant Donald G. Brown II, as the elected Sheriff of Catawba County, was the final policymaker for the Catawba County Sheriff's Office ("CCSO") with respect to employee discipline, internal investigations and internal-affairs procedures, separation decisions, and CCSO's required reporting and communications to state entities concerning deputy credibility and certification-related consequences.

121.    The constitutional deprivations alleged herein, including the imposition and publication of stigmatizing credibility determinations without meaningful notice or an opportunity to be heard, were caused by CCSO policies, customs, and practices attributable to Brown as final policymaker. Those policies, customs, and practices included the use of internal-affairs mechanisms and separation processes to impose career-ending credibility

stigma, and the submission of state-level separation reporting reflecting "substantiated untruthfulness," without providing a meaningful name-clearing process.

122.     In addition, Brown ratified and caused the unconstitutional actions described herein by approving, authorizing, or knowingly permitting the conduct at issue, including by signing and causing the submission and publication of the F-5 reflecting "substantiated allegation(s) of untruthfulness," and by failing to provide, offer, or ensure a meaningful name-clearing opportunity to correct or contest the stigmatizing designation before and after its publication.

123.     CCSO, through Brown in his official capacity, is therefore liable under 42 U.S.C. § 1983 for the constitutional violations alleged herein, and Plaintiff is entitled to declaratory and injunctive relief, compensatory damages, and other relief as allowed by law.

### Count V: Disability Discrimination (Rehabilitation Act, 29 U.S.C. § 794)
### (Against Brown in his official capacity)

124.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

125.     Plaintiff had a disability within the meaning of Section 504 of the Rehabilitation Act, and/or had a record of such a disability, and/or was regarded as disabled, including concussion/mild traumatic brain injury ("mTBI") and related cognitive and functional limitations during a medically documented impairment period.

126.     Plaintiff was a qualified individual who, with reasonable accommodation, could perform the essential functions of her position. Reasonable accommodations during the post-concussion period included, among other things, accommodation in administrative and investigative processes affecting Plaintiff's employment, including reasonable pacing and structure of questioning, respect for medically documented restrictions, and postponement or modification of high-stakes interrogation during an "unable to work" period.

127.     Defendants had actual and/or constructive notice of Plaintiff's disability and restrictions. Plaintiff's work-status documentation and medical restrictions were generated through Employee Health Connection ("EHC") for CCSO workplace purposes, and Plaintiff provided CCSO notice of her post-concussion limitations and work status.

128.     Despite that notice, Defendants subjected Plaintiff to adverse treatment and denied reasonable accommodation by proceeding with high-stakes internal-affairs interrogation and coercive employment pressure during the medically documented impairment period, including refusing Plaintiff's request to slow questioning due to concussion symptoms and continuing the process in a manner that foreseeably exploited Plaintiff's cognitive vulnerability.

129.     As a result of Defendants' actions, Plaintiff suffered adverse employment consequences, including forced separation and the imposition and publication of stigmatizing credibility-related outcomes, and Plaintiff's medical condition and related symptoms were exacerbated.

130.     Upon information and belief, CCSO and/or the Sheriff's Office receives federal financial assistance and is therefore subject to Section 504 of the Rehabilitation Act.

131.     By the conduct alleged herein, Defendants discriminated against Plaintiff on the basis of disability in violation of Section 504 of the Rehabilitation Act, entitling Plaintiff to compensatory damages, equitable relief, attorneys' fees, and other relief as allowed by law.

### Injunctive and Declaratory Relief

132.     Plaintiff realleges and incorporates the foregoing allegations as if fully set forth herein.

133.     Plaintiff seeks a declaration that Defendants' conduct, as described above, violated Plaintiff's rights under the First and Fourteenth Amendments to the United States

Constitution and Section 504 of the Rehabilitation Act, including by imposing, adopting, and publishing stigmatizing allegations of dishonesty in connection with Plaintiff's separation from employment without constitutionally adequate notice and a meaningful opportunity to be heard.

134.     Plaintiff further seeks a declaration that the designation of "substantiated allegation(s) of untruthfulness," recorded and transmitted through North Carolina's separation reporting process and reflected in CCSO records, constitutes stigmatizing state action that was imposed in connection with adverse employment action and has materially altered Plaintiff's legal and professional status, with foreseeable and continuing consequences for Plaintiff's ability to obtain and maintain employment in law enforcement.

135.     Plaintiff seeks prospective injunctive relief requiring Defendants to provide a meaningful name-clearing hearing before a neutral decisionmaker, with reasonable notice of the specific allegations and evidence relied upon, a meaningful opportunity to respond, and an opportunity to present evidence and address adverse evidence concerning the factual basis for branding Plaintiff as "untruthful."

136.     Plaintiff also seeks prospective injunctive relief requiring Defendants to take reasonable steps, consistent with applicable North Carolina reporting procedures and practices, to remedy the ongoing effects of the stigmatizing designation, including by correcting, amending, withdrawing, or formally annotating the F-5 separation reporting and related CCSO records to reflect the outcome of the name-clearing process and to remove or mitigate the "untruthfulness" designation to the extent it is unsupported, procedurally defective, or maintained without due process.

137.     Plaintiff further seeks prospective injunctive relief prohibiting Defendants from continuing to publish, republish, rely upon, or disseminate stigmatizing dishonesty findings

as an official basis for separation or employability-related communications without first providing constitutionally adequate process, including a meaningful name-clearing opportunity.

138.　　Plaintiff seeks such other and further prospective equitable relief as the Court deems just and proper to prevent ongoing harm and to restore, as nearly as possible, Plaintiff's ability to pursue her chosen profession free from unconstitutional stigma and disability-based discrimination.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendants, and grant the following relief:

1. **Liability.** That the Court find Defendants liable to Plaintiff on all claims asserted.

2. **Declaratory Relief.** Declaratory judgment pursuant to 28 U.S.C. § 2201 and other applicable law, declaring that Defendants' acts, omissions, policies, customs, and practices violated Plaintiff's rights under: the First Amendment to the United States Constitution; the Fourteenth Amendment to the United States Constitution (including stigma-plus and denial of procedural due process and a meaningful name-clearing opportunity); 42 U.S.C. § 1983; and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; and declaring such acts, omissions, and practices unlawful and unconstitutional.

3. **Compensatory Damages.** Compensatory damages against Defendants, jointly and severally as applicable, in an amount to be determined by a jury, including but not limited to:

   a. Economic losses, including lost wages, lost earning capacity, loss of benefits, back pay, front pay, and other economic damages;

   b. Non-economic losses, including emotional distress, mental anguish, humiliation, and pain and suffering;

c. Reputational harm and stigma, including harm resulting from the Giglio-related credibility impairment and the State-level publication of "substantiated allegation(s) of untruthfulness"; and

d. Consequential losses, including lost career opportunities and inability to obtain comparable law-enforcement employment.

4. **Punitive Damages.** Punitive damages against the individual Defendants, in an amount to be determined by a jury, to the extent permitted by law, for willful, malicious, reckless, and wanton disregard of Plaintiff's federally protected rights.

5. **Injunctive and Equitable Relief.** Prospective injunctive and equitable relief, including but not limited to:

a. A prompt and meaningful name-clearing hearing before a neutral decisionmaker, with reasonable notice and a meaningful opportunity to be heard and to respond to adverse evidence concerning the allegations used to brand Plaintiff as "untruthful";

b. An order requiring Defendants to take reasonable steps, consistent with applicable North Carolina reporting procedures and practices, to correct, amend, withdraw, or formally annotate the F-5 separation reporting and related CCSO records to reflect the outcome of the name-clearing process and to remove or mitigate the "untruthfulness" designation to the extent it is unsupported or maintained without due process;

c. An order prohibiting Defendants from continuing to publish, republish, rely upon, or disseminate stigmatizing dishonesty findings as an official basis for separation or employability-related communications without constitutionally adequate process, including a meaningful name-clearing opportunity; and

d.  Preservation of all evidence, documents, communications, and electronic data related to this matter pending final resolution of this action.

6. **Attorneys' Fees and Costs.** Attorneys' fees and costs pursuant to 42 U.S.C. § 1988 (for the federal constitutional claims), the Rehabilitation Act and other applicable provisions, and any other applicable statute, rule, or equitable principle.

7. **Interest.** Pre-judgment and post-judgment interest on all monetary awards at the maximum rate permitted by law.

8. **Jury Trial.** A trial by jury on all issues so triable.

9. **Other Relief.** Such other and further relief as the Court deems just, proper, and equitable under the circumstances.

Dated: February 26, 2026   *Counsel for Plaintiff:*

/s C. Christopher Adkins
N.C. Bar No. 46950
Adkins Law, PLLC
9620 Sherrill Estates Road
Huntersville, North Carolina 28078
Phone: (704) 274-5677
Fax: (877) 208-7577
chris@huntersvillelawyer.com

/s Christerfer R. Purkey
N.C. Bar No. 53584
Rech Law, P.C.
18125 W. Catawba Avenue
Cornelius, North Carolina 28031
(704) 228-2790 phone
(704) 909-7410 fax
cpurkey@rechlaw.com
*Admission in W.D.N.C. pending

*** Verification Page to Follow ***

## VERIFICATION

I, **Victoria Jolly**, being duly sworn, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing Complaint and know the contents thereof; that the factual allegations contained therein are true and correct to the best of my knowledge, information, and belief; and that the matters stated upon information and belief are believed by me to be true.

Executed on this 26 day of February, 2026.

_____

**Victoria Jolly**

STATE OF NORTH CAROLINA

COUNTY OF _Mecklenburg_

Subscribed and sworn to (or affirmed) before me this 26 day of February, 2026, by **Victoria Jolly**, who is personally known to me or who has produced _Drivia license 258gioii NC DMV_ as identification.

_____

Notary Public

My Commission Expires: _Aug. 16, 2028_

[Notary Seal]

CHARLES CHRISTOPHER ADKINS
Notary Public
North Carolina
Mecklenburg County